**Opinion issued November 7, 2019**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-18-00593-CR

————————————

**JUAN JESUS VILLARREAL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 371st District Court
Tarrant County, Texas[1]
Trial Court Case No. 1493076D

## MEMORANDUM OPINION

A jury convicted Juan Jesus Villarreal of capital murder.[2] Because the State

did not seek the death penalty, the trial court automatically assessed Villarreal's

---

[1] The Texas Supreme Court transferred this appeal from the Court of Appeals for the Second District of Texas. *See* TEX. GOV'T CODE § 73.001 (authorizing transfer of cases between courts of appeals).

punishment at confinement for life without parole.[3] On appeal, Villarreal contends that he received ineffective assistance of counsel because his attorneys failed to file a motion to suppress his statements. He also contends that the trial court erred by not instructing the jury that one of the State's witnesses was an accomplice as a matter of fact. We affirm.

## Background

This case centers around the murder of Moses Prieto ("Moses"). The key individuals who were present during the relevant events include Villarreal, Kyle, Rose, Clay, Eva, Manny, and Tiffannie Olivero ("Tiffannie").

### A. Witness testimony

At trial, Tiffannie, an acquaintance of Villarreal, testified to these details. Villarreal and Kyle shared an apartment as roommates. In March 2017, Villarreal, Kyle, Rose, Clay, Eva, Manny, and Tiffannie, Kyle's then-girlfriend, were at the apartment. Everyone except Tiffannie gathered in a room. Tiffannie was in another room and could not hear what the others were discussing. Eva and Manny left the apartment.

---

[2]  TEX. PEN. CODE § 19.03 (a)(2) (providing that a person commits the offense of capital murder if he murders a person "in the course of committing or attempting to commit kidnapping").

[3]  *See id.* § 12.31.

Around midnight, Villarreal, Rose, Clay, and Tiffannie left Kyle and Villarreal's apartment. Tiffannie thought they were picking up money for a vehicle Rose had sold. As they got into the truck, Tiffannie saw that Rose had zip ties and a semiautomatic handgun with her. She saw Rose put the zip ties in the glove compartment and the gun between the driver's seat and the center console.

After they drove away from the apartment, Tiffannie heard Villarreal say, "I might stab him a few times." Alarmed by this statement, Tiffannie asked, "So, what are we going to do?" She was told, "We're going to get Moses." At that point, Tiffannie realized that she did not want to be part of what was about to happen. The State's attorney asked her, "Did you feel that you could get out of the truck at that time?" Tiffannie responded, "No."

Eventually, they arrived where Moses was located. Rose turned off the truck and the headlights, and then they sat and waited. Tiffannie saw Eva and Manny inside a gold-colored car parked in front of a house. She also saw Moses leave the house and enter the car. Just as the car started driving away, Rose said, "Okay. I'm going to go ahead and cut them off, and we're going to get him out of the back seat of the car." Rose drove the truck in reverse down the street, waited for the gold car to pass, and then sped up and cut it off, causing the gold car to stop.

Villarreal and Rose got out of the truck and approached the car. Rose took the gun and zip ties with her and put them in her pocket. Villarreal and Rose tried

to get Moses out of the back seat of the car, but he fought back against them. Rose called for Clay to get out of the truck, which he did. Tiffannie saw that Moses had zip ties around his ankle. Tiffannie saw Rose get into the car with blood "on the bottom part of her clothes."

Villarreal remained outside the truck with Moses, and he said to him, "We're going to shoot you if you don't get in the truck." Rose handed Villarreal the gun, and Villarreal shot Moses once in the leg. Moses started screaming, and Villarreal told him, "Just get in the truck." When Moses did not comply, Villarreal looked at Rose and asked, "Dead or alive?" Rose responded, "Dead." Villarreal then shot Moses two more times, and Moses fell to the ground. Villarreal handed the gun to Rose and said, "I need you to get rid of this." By this time, Villarreal, Rose, Clay, and Tiffannie were all in the truck. Rose took Villarreal back to his apartment. Then, Rose took Clay and Tiffannie to a vacant apartment. Rose told Clay and Tiffannie to remove their clothes and gave them other clothes to wear. Rose became concerned that Tiffannie would talk to the police, so she beat Tiffannie. Later, Rose's ex-boyfriend arrived at the apartment. Rose handed him the gun and all of their clothes. Eventually, Clay and Tiffannie left the apartment.

## B.    The police investigation

Meanwhile, multiple 911 calls were placed reporting gunshots and that a person was lying in the street. Officers Pelton and Stone arrived at the scene first.

4

At first, Moses appeared to be dead, but then he started moving around and making noises. They saw that Moses had two zip ties binding his legs together and a zip tie on each wrist that were unconnected. Moses told Officer Pelton, "I'm going to die. I'm going to die." Officer Pelton asked Moses, "Who did this to you?" Moses responded, "Jesse Villarreal." Later, Moses was transported to the hospital where he died from the gunshot wounds.

Detective Barron received a call from W. Rehart. Rehart stated that she wanted to share information about Moses's death. Detective Barron asked Rehart to come into the homicide office to discuss the matter in person, and she agreed. She stated Villarreal went to her home and told her that he had done a "street court" job, but it went too far and he killed someone.[4] Villarreal told her that he was looking for somewhere to hide. Rehart provided Villarreal with money for a cab. Although Villarreal did not tell her who he killed, Rehart later learned that Moses had been killed. She visited Villarreal's apartment to deliver food "earlier in the week" and she realized something was strange because an unidentified man "spoke to her outside of the door and told her that Villarreal was not there."[5] After

---

[4]   The arrest warrant affidavit describes a "street court" job as a "method of settling disputes between individuals."

[5]   Rehart did not tell Detective Barron precisely when she visited Villarreal's apartment—whether before or after the shooting. According to her summary of events, Rehart stated that she "knew that this . . . [visit occurred] earlier in the week but could not recall the exact night."

she dropped off the food, Villarreal sent her a Facebook message "saying that it was okay and he was home now." After providing Detective Barron with this information, Rehart gave him her cell phone and Facebook password "so that the time frame of her visit to the apartment could be verified through the messages." Detective Barron then showed Rehart a photograph of Villarreal taken from the police information portal, and she confirmed that the photo was of the person she had just described.

## C.   The arrest warrant and police interrogation

After his meeting with Rehart concluded, Detective Barron applied for a warrant to arrest Villarreal and attached a probable-cause affidavit. The affidavit named Rehart as the informant. The information imparted to Detective Barron by Rehart in a face-to-face conversation revealed that she had personal or direct knowledge of the matters she asserted. Rehart explained that Villarreal told her that he had killed someone. Rehart named Moses as the person Villarreal had killed—a fact that had not been disclosed to the public. Not only did she identify Villarreal by name, she also confirmed his identity when Detective Barron showed her a photograph of Villarreal from the police information portal. And she allowed Detective Barron to go through her Facebook messages to verify the timeline of events from when she visited Villarreal's apartment.

6

Villarreal was arrested for murder, which was later amended to capital murder because of the attempted kidnapping. While Villarreal was in police custody, Detectives Barron and O'Brien interviewed him about the murder. Detective Brown started the investigation by asking Villarreal routine booking questions, including his name, date of birth, address, and education level.[6] Later, the following exchange occurred:

| | |
|---|---|
| **Villarreal**: | If I'm— if I'm already charged— |
| **Detective Barron**: | You're arrested, you're not charged. You're arrested. |
| **Villarreal**: | Okay. Well, shouldn't I have my lawyer present then? |
| **Detective Barron**: | Um, let me get through this and that'll be your opportunity to— to— |
| **Villarreal**: | Wouldn't that be in my best interest? |
| **Detective Barron**: | Well, that — that's a decision that you have to make. I told you my two cents early on. You make that decision for you, but understand that — |
| **Villarreal**: | I'm — |
| **Detective Barron**: | If that's your decision, I'm good with that. I'll honor that, okay? |

---

[6] *Alford v. State*, 358 S.W.3d 647, 654 (Tex. Crim. App. 2012) (citing *Pennsylvania v. Muniz*, 496 U.S. 582 (1990)) (explaining that routine booking questions do not violate *Miranda v. Arizona*, 384 U.S. 436 (1966), because they are "reasonably related to the police's administrative concerns").

| | |
|---|---|
| **Villarreal**: | Okay. |
| **Detective Barron**: | But, if that is your decision, understand that I have to go based off what I know, okay? |
| **Villarreal**: | Cause I've heard, I've heard of what — what's being said, and it's — it's all bullshit. So that — |
| **Detective Barron**: | Okay, well you're the only one that straighten that all out for me. So — |
| **Villarreal**: | That's what everybody keeps telling me. |
| **Detective Barron**: | Let me, let me get through this and — and if you're telling me you want an attorney then we're out of here if, if that — let me get through this real quick. |

At that point, Detective Barron read Villarreal his *Miranda* rights. *See* TEX. CRIM. PROC. CODE art. 38.22 §§ 2(a), 3(a). The conversation continued. Villarreal claimed an alibi, saying that he was with his girlfriend at the time of the murder. Detective Barron then stated, "We can't talk to you until you tell us you want to talk to us." In response, Villarreal stated, "Let's see where we get with this, man." Villarreal kept talking to Detective Barron and Detective O'Brien and answering questions. Although he denied shooting Moses, Villarreal admitted that he was present when Moses was shot and helped remove Moses from the car.

8

**D.      The jury trial**

Villarreal was indicted for capital murder. The State waived the death penalty. The jury found Villarreal guilty of capital murder, and the trial court assessed Villarreal's punishment at confinement for life without the possibility of parole. This appeal followed.

## Ineffective Assistance of Counsel Claims

Villarreal contends he received ineffective assistance of counsel because his defense attorneys failed to file a motion to suppress the arrest warrant and object to Villarreal's custodial statement based on voluntariness.

**A.      Standard of review**

We evaluate claims of ineffective assistance of counsel under the test enunciated by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668 (1984). To establish that trial counsel rendered ineffective assistance, an appellant must show, by a preponderance of the evidence, that (1) his counsel's performance was deficient and (2) there is a reasonable probability that the result of the proceeding would have been different but for his counsel's deficient performance. *Id.* at 687; *Burch v. State*, 541 S.W.3d 816, 823 (Tex. Crim. App. 2017); *Ex parte Estrada*, 573 S.W.3d 884, 890 (Tex. App.—Houston [1st Dist.] 2019, no pet.). An appellant must satisfy both *Strickland* elements, and the failure to show either deficient performance or prejudice will defeat the claim. *Williams v.*

*State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009) ("An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong.").

We indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance, and therefore, the appellant must overcome the presumption that the challenged action constituted "sound trial strategy." *Strickland*, 466 U.S. at 688; *Ex parte Moore*, 395 S.W.3d 152, 157 (Tex. Crim. App. 2013). The proper measure of attorney performance is "simply reasonableness under prevailing professional norms" considering all the circumstances. *Strickland*, 466 U.S. at 688; *Rosales v. State*, 4 S.W.3d 228, 231 (Tex. Crim. App. 1999) (en banc). Our review of counsel's performance is highly deferential to counsel, and we do not speculate on reasons for trial counsel's actions when the record is silent. *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002); *Gamble v. State*, 916 S.W.2d 92, 93 (Tex. App.—Houston [1st Dist.] 1996, no pet.). We solely rely on the record to "affirmatively demonstrate the alleged ineffectiveness." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Even if counsel's representation was objectively deficient, the appellant must still prove that the deficient performance prejudiced his defense. *Ex parte McFarland*, 163 S.W.3d 743, 754 (Tex. Crim. App. 2005) (en banc). To show

prejudice in capital cases, "the question is whether the defendant would not have been found guilty of capital murder." *Id.*

## B.     Failure to file motion to suppress the arrest warrant

Villarreal's first claim of ineffective assistance is that his attorneys failed to file a motion to suppress his custodial statement because it was the product of an illegal arrest based on a deficient arrest-warrant affidavit. Villarreal asserts that the arrest warrant lacked probable cause because the officer's affidavit did not include a statement about the credibility of the witness, the criminal history of the witness, or the result of his investigation based on the witness's statements. To satisfy *Strickland*, Villarreal must "prove that the motion to suppress would have been granted." *Jackson v. State*, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998).

To obtain an arrest warrant, an affidavit must include sufficient information to support an independent determination that probable cause exists for a neutral and detached magistrate to find probable cause. *Castillo v. State*, 739 S.W.2d 280, 290 (Tex. Crim. App. 1987) (en banc); *see Horhn v. State*, 481 S.W.3d 363, 369 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd). Our review of an arrest-warrant affidavit is limited to the four corners of the affidavit. *State v. Duarte*, 389 S.W.3d 349, 354, 360 (Tex. Crim. App. 2012). We must defer to the magistrate's finding of probable cause if, under the totality of the circumstances, the affidavit shows a

11

substantial basis for the conclusion. *Hyland v. State*, 574 S.W.3d 904, 911 (Tex. Crim. App. 2019).

Information obtained from a named informant is "inherently reliable." *State v. Ford*, 537 S.W.3d 19, 26 (Tex. Crim. App. 2017) ("citizen informants who identify themselves 'are considered inherently reliable'"); *see Taflinger v. State*, 414 S.W.3d 881, 885 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ("When a citizen-informant provides self-identifying information that makes himself accountable for the intervention, the degree of reliability of a tip significantly improves."). An arrest-warrant affidavit that identifies a named informant is sufficient if it is detailed enough to suggest the informant's direct knowledge of the information. *See, e.g.*, *Hennessy v. State*, 660 S.W.2d 87, 91 (Tex. Crim. App. 1983) ("Urquhart's credibility and reliability are established because he was a named informant, and because he gave detailed information about Barnes' activities which was substantially corroborated by independent police investigation."); *Rios v. State*, 376 S.W.3d 238, 243 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (explaining that an affidavit containing information given by a named informant justifies issuing an arrest warrant as long as the information given is "sufficiently detailed to suggest direct knowledge on the informant's part"). There is no requirement that an affidavit affirmatively state that an

12

informant is credible or reliable. *State v. Elrod*, 538 S.W.3d 551, 559 (Tex. Crim. App. 2017).

The failure to file a motion to suppress evidence is not per se ineffective assistance of counsel. *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986); *Carmen v. State*, 358 S.W.3d 285, 295 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). If a suppression motion would have been futile, it is not ineffective to not file the motion. *See Mooney v. State*, 817 S.W.2d 693, 698 (Tex. Crim. App. 1991) (explaining that counsel need not engage in the filing of futile motions); *Harris v. State*, No. 01-11-00415-CR, 2014 WL 1912539, at *6 (Tex. App.—Houston [1st Dist.] May 13, 2014, no pet.) (mem. op., not designated for publication) (concluding counsel not ineffective for failing to file pretrial motion to suppress). The record does not establish that a motion to suppress would have been granted because Rehart, a named informant, provided detailed information suggesting her direct knowledge of the information provided to her by Villarreal. Thus, Villarreal has not established ineffective assistance by counsel's failure to file a futile motion to suppress.

## C.     Failure to object to custodial statement based on voluntariness

Villarreal's second ineffective-assistance claim is that his attorneys failed to object to the voluntariness of statements he made during a custodial interrogation admitting that he was present when Moses was shot and that he helped physically

13

remove Moses from a vehicle, which violated his rights under the Fifth Amendment of the United States Constitution, Article I, Section 9 of the Texas Constitution, and Article 38.22 of the Texas Rules of Criminal Procedure.

The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Similarly, the Texas Constitution Article I, Section 10 states that "[i]n all criminal prosecutions the accused . . . shall not be compelled to give evidence against himself, and shall have the right of being heard by himself or counsel, or both." "Any invocation of the Fifth Amendment right must be viewed liberally and in the light most favorable to its legitimacy." *In re Medina*, 475 S.W.3d 291, 299 (Tex. Crim. App. 2015) (citing *Hoffman v. U.S.*, 341 U.S. 479, 486 (1951)). A defendant's statement may be used as evidence against him if he made it freely and voluntarily made without compulsion or persuasion. TEX. CODE CRIM. PROC. art. 38.21. A defendant may claim his statement was not freely and voluntarily under three theories: "(1) Article 38.22, § 6—general voluntariness; (2) *Miranda v. Arizona*[7] as expanded in Article 38.22, §§ 2 and 3 (the Texas confession statute); or (3) the Due Process Clause." *Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008).

In *Miranda v. Arizona*, the Supreme Court explained that a person who is questioned by the police after he is "taken into custody or otherwise deprived of

---

7       384 U.S. at 436.

14

his freedom of action in any significant way" must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444. Statements taken in violation of *Miranda* are inadmissible in a criminal trial. *See Akins v. State*, 202 S.W.3d 879, 890 (Tex. App.—Fort Worth 2006, pet. ref'd). This *Miranda* rule is "a judicially imposed rule of evidence: questioning in violation of *Miranda* is not itself illegal; the answers to such questioning are simply inadmissible in court." *Baker v. State*, 956 S.W.2d 19, 24 (Tex. Crim. App. 1997) (en banc). Incorporating *Miranda*, Article 38.22 prohibits the use of an accused's incriminating statement made during a custodial interrogation unless he received the warnings provided in Article 15.17 or Article 38.22 section 2(a) or section 3(a). TEX. CRIM. PROC. CODE art. 38.22 §§ 2(a), 3(a).

We first note that Villarreal's inquiry—"Well, shouldn't I have my lawyer present then?"—did not invoke Detective Barron's duty to stop the interrogation because Villarreal's inquiry was equivocal, and he engaged in further discussions and asked additional questions. In Texas, when a suspect asks for a lawyer, the interrogation must stop until counsel has been provided or the suspect initiates more communication with police. *Davis v. State*, 313 S.W.3d 317, 339 (Tex. Crim. App. 2010). A suspect's request for a lawyer during a custodial interrogation must

15

be unequivocal under the totality of the circumstances. *Id.*; *Davis v. United States*, 512 U.S. 452, 458–59 (1994). Statements such as "Maybe I should talk to a lawyer" and "I should have an attorney" do not constitute unequivocal requests for counsel to terminate police interrogation when the suspect continues to talk and ask additional questions. *Id.* Villarreal did not unequivocally request a lawyer through his question, and then he continued to engage in the discussion with Detective Barron. Thus, Detective Barron did not have to terminate the interrogation and provide Villarreal an attorney.

We also note that Villarreal waived his Fifth Amendment right to counsel. After Detective Barron gave Villarreal his Article 15.17 warnings, Villarreal did not request an attorney or ask the detectives to stop their questioning. *See Pecina v. State*, 361 S.W.3d 68, 80 (Tex. Crim. App. 2012). Rather, Villarreal kept talking to the detectives and answering their questions. *See id.* Based on these circumstances, we conclude that Villarreal freely and voluntarily waived his right to counsel during his questioning. *Id.*

We overrule Villarreal's first issue.

**Jury Instruction**

Villarreal contends that the trial court erred by failing to submit a jury instruction under Article 38.14 of the Texas Code of Criminal Procedure, which requires a jury to find the testimony of an accomplice witness was corroborated

16

before it can rely on that testimony for a conviction. Villarreal asserts that he was entitled to a sua sponte jury instruction stating that Tiffannie may have been an accomplice under the accomplice-in-fact theory because she was "present in the apartment when the planning meeting took place," served as a "lookout when the attack was carried out," and "tampered with the evidence by removing her own clothes" for disposal.

## A.     Standard of review and applicable law

We review a trial court's failure to include an accomplice-witness instruction in a jury charge for an abuse of discretion. *Delacerda v. State*, 425 S.W.3d 367, 395 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *see Paredes v. State*, 129 S.W.3d 530, 538 (Tex. Crim. App. 2004). A trial court abuses its discretion only if its decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008). The trial court must give the jury a written charge that sets forth the applicable law. TEX. CODE CRIM. PROC. art. 36.14; *Oursbourn*, 259 S.W.3d at 179. When a party contends that the trial court erred in its charge to the jury, we must determine whether the charge was erroneous and, if so, whether the error was harmful. *Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002).

An accomplice is one who participates with the defendant before, during, or after the commission of the crime and acts with the required culpable mental state

17

for the crime. *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007). In this context, participation means the witness promoted the commission of the defendant's charged offense. *Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006). "Mere presence at a crime scene does not make an individual an accomplice, nor is an individual an accomplice merely because he has knowledge about a crime and fails to disclose that knowledge." *Id*.

If the witness participates in the commission of the crime through affirmative acts and maintains the required mental state, the witness will be considered either an accomplice as a matter of law or an accomplice as a matter of fact. *Id*. An accomplice as a matter of law is a witness who has been, or could have been, indicted for the same offense. *Id*.; *Ash v. State*, 533 S.W.3d 878, 886 (Tex. Crim. App. 2017) (providing examples of an accomplice as a matter of law). If the evidence presented by the parties is conflicting and it remains unclear whether the witness is an accomplice, then the jury must decide whether the inculpatory witness is an accomplice as a matter of fact under instructions defining the term "accomplice." *Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006). The trial court need not give the jury an accomplice-witness instruction when the evidence is clear that the witness is neither an accomplice as a matter of law nor as a matter of fact. *Id*.

**B.**     **Jury charge was not erroneous**

Article 38.14 of the Texas Code of Criminal Procedure provides:

> A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

TEX. CODE CRIM PROC. art. 38.14; *see Nelson v. State*, 297 S.W.3d 424, 429 (Tex. App.–Amarillo 2009, pet. ref'd). The purpose of an accomplice-witness instruction "merely reminds the jury that it cannot use the accomplice's testimony to convict the defendant unless there also exists some non-accomplice testimony tying the defendant to the offense." *Cocke*, 201 S.W.3d at 747.

The State contends that no accomplice-witness instruction was required because Tiffannie was not an accomplice. First, nothing in the record shows that Tiffannie maintained the requisite mens rea for murder and attempted kidnapping. Second, the evidence at trial showed that Tiffannie was present in Villarreal's apartment at the time of the planning meeting, but she was in another room where she could not hear the conversation. Third, the evidence showed that Tiffannie stayed in the truck when the attack occurred. She testified that she felt like she could not get out of the truck before the attack. Finally, the evidence showed that Tiffannie removed her clothes on Rose's demand while Rose still had the gun used in the attack.

19

No evidence was presented at trial to show that Tiffannie played any role in the attempted kidnapping and murder. She was merely present before, during, and after the crime, and mere presence at a crime scene does not make a person an accomplice. *See Cocke*, 201 S.W.3d at 748. And Tiffannie's failure to stop the commission of the crimes does not render her an accomplice because a failure to intervene does not constitute an affirmative act to promote the crimes. *See, e.g.*, *Lane v. State*, 991 S.W.2d 904, 907 (Tex. App.—Fort Worth 1999, pet. ref'd) (witness who was present "during the entire series of events" and "knew full well what the other three actors were doing," but did not stop crime or alert anyone "committed no affirmative act in furtherance of the crime," because she omitted to act). According to Tiffannie, she thought they would pick up money from Rose's car sale. She testified that she "did not want to be part of what was about to happen" but felt like she was unable to leave after seeing Rose with the gun and zip ties and hearing someone say, "We're going to get Moses." Because Tiffannie was not an accomplice, Villarreal was not entitled to an accomplice-in-fact jury instruction.[8] *See Druery*, 225 S.W.3d at 499–500 (holding that the defendant was

---

[8]     Although it is not necessary to the resolution of this case, Villarreal cannot demonstrate harm in light of his confession and Moses's dying declaration identifying Villarreal as the shooter. *See Medina v. State*, 7 S.W.3d 633, 642 (Tex. Crim. App. 1999) (en banc) (ruling the trial court's failure to give accomplice-as-a-matter-of-fact instruction was harmless error because there was "substantial non-accomplice evidence linking appellant to the offense," including eyewitness

not entitled to an accomplice-witness instruction based on the testimony of witnesses who admitted to be being present at the murder, had reason to believe the complainant would be murdered, disposed of evidence after the murder, but denied participating in the murder itself). We hold that the trial court did not err by failing to submit a jury instruction sua sponte under Article 38.14 of the Texas Code of Criminal Procedure and overrule Villarreal's second issue.

## Conclusion

We affirm the judgment of the trial court.

Sarah Beth Landau
Justice

Panel consists of Justices Lloyd, Goodman, and Landau.

Do not publish. TEX. R. APP. P. 47.2(b).

---

testimony identifying the appellant as the shooter and the appellant's own incriminating statements to non-law-enforcement witnesses).